**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1691**
_____

MONTGOMERY COUNTY, MARYLAND, on behalf of itself and all others similarly situated,

Plaintiff - Appellant,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, a corporation; FEDERAL HOME LOAN MORTGAGE CORPORATION, a corporation; FEDERAL HOUSING FINANCE AGENCY, a federal agency, as conservator for Federal National Mortgage Association and Federal Home Loan Mortgage Corporation,

Defendants - Appellees,

UNITED STATES OF AMERICA,

Intervenor.

_____

Appeal from the United States District Court for the District of Maryland, at Greenbelt.    Deborah K. CHASANOW, District Judge. (8:13-cv-00066-DKC)

_____

**No. 13-1752**
_____

DALE L. BUTTS, as Register of Deeds of Beaufort County, South Carolina, individually and on behalf of all others similarly situated; JOHN HOPKINS, as Register of Deeds of Richland County, South Carolina, on behalf of himself and all others similarly situated,

Plaintiffs - Appellants,

and

GAIL LANEY, as Register of Deeds of Orangeburg County, on behalf of themselves and all others similarly situated; JAMES B. HIERS, as Register of Deeds and Clerk of Court of Bamberg County, on behalf of themselves and all others similarly situated; RHONDA MCELVEEN, as Register of Mesne Conveyances and Clerk of Court of Barnwell County, on behalf of themselves and all others similarly situated; CHARLIE LYBRAND, as Register of Mesne Conveyances of Charleston County, on behalf of themselves and all others similarly situated; TIMOTHY NANNEY, as Register of Deeds of Greenville County, on behalf of themselves and all others similarly situated; BALLERY SKIPPER, as Register of Deeds of Horry County, on behalf of themselves and all others similarly situated; DAVID ADAMS, as Treasurer of Richland County, on behalf of themselves and all others similarly situated,

       Plaintiffs,

    v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, a/k/a Fannie Mae, a federally chartered private corporation; FEDERAL HOME LOAN MORTGAGE CORPORATION, a/k/a Freddie Mac, a federally chartered private corporation,

       Defendants - Appellees,

FEDERAL HOUSING FINANCE AGENCY, Conservator of Federal National Mortgage Association; Conservator of Federal Home Loan Mortgage Corporation,

       Intervenor/Defendant - Appellee,

UNITED STATES OF AMERICA,

       Intervenor.

_____

Appeal from the United States District Court for the District of South Carolina, at Beaufort. Richard Mark GERGEL, District Judge. (9:12-cv-01912-RMG)

_____

Argued: December 11, 2013      Decided: January 27, 2014

_____

Before TRAXLER, Chief Judge, and NIEMEYER and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Traxler and Judge Duncan joined.

---

**ARGUED:** Don Springmeyer, WOLF RIFKIN SHAPIRO SCHULMAN & RABKIN, LLP, Las Vegas, Nevada, for Appellants. Michael Alexander Johnson, ARNOLD & PORTER, LLP, Washington, D.C., for Appellees. Patrick J. Urda, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF:** Howard N. Cayne, Asim Varma, Dirk C. Phillips, ARNOLD & PORTER LLP, Washington, D.C., for Appellee Federal Housing Finance Agency. Jill Nicholson, Chicago, Illinois, Michael D. Leffel, FOLEY & LARDNER LLP, Madison, Wisconsin, for Appellee Federal National Mortgage Association. Michael J. Ciatti, Merritt E. McAlister, KING & SPALDING LLP, Washington, D.C., for Appellee Federal Home Loan Mortgage Corporation. Kathryn Keneally, Assistant Attorney General, Tamara W. Ashford, Principal Deputy Assistant Attorney General, Gilbert S. Rothenberg, Jonathan S. Cohen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, William J. Nettles, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Intervenor.

---

NIEMEYER, Circuit Judge:

The question presented in these appeals is whether the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") are exempt from the payment of state and local taxes imposed on the transfer of real property in Maryland and South Carolina. Fannie Mae and Freddie Mac claim that they are exempt from such transfer taxes under 12 U.S.C. §§ 1723a(c)(2) and 1452(e), respectively. Counties in Maryland and South Carolina (the "Counties"), however, which collect transfer taxes, claim (1) that those exemptions do not, as a matter of statutory interpretation, apply to state and local taxes relating to real property, including transfer taxes, and (2) that, in any event, exempting Fannie Mae and Freddie Mac from state and local transfer taxes for real property would be unconstitutional as an infringement on the States' taxing power.

The district courts in Maryland and South Carolina rejected the Counties' arguments, concluding that the general tax exemptions applicable to Fannie Mae and Freddie Mac, while not applicable to real property taxes, did cover real property transfer taxes, thus making a distinction between property taxes and transfer taxes. The courts also concluded that Congress, in providing the tax exemptions to Fannie Mae and Freddie Mac, acted within its Commerce Clause power.

4

We agree with the district courts, as explained herein, and affirm.

I

Congress created Fannie Mae during the Great Depression to provide banks with more capital for mortgage lending. See generally Richard W. Bartke, Fannie Mae and the Secondary Mortgage Market, 66 Nw. U. L. Rev. 1 (1971). Its charter describes its purposes as follows:

> The Congress declares that the purposes of this subchapter are to establish secondary market facilities for residential mortgages, to provide that the operations thereof shall be financed by private capital to the maximum extent feasible, and to authorize such facilities to --
>
> (1) provide stability in the secondary market for residential mortgages;
>
> (2) respond appropriately to the private capital market;
>
> (3) provide ongoing assistance to the secondary market for residential mortgages . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing;
>
> (4) promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and
>
> (5) manage and liquidate federally owned mortgage portfolios in an orderly manner, with a minimum of adverse effect upon the residential mortgage market and minimum loss to the Federal Government.

12 U.S.C. § 1716.  While Fannie Mae was originally created as a government corporation, Congress split it in 1968, creating the Government National Mortgage Association ("Ginnie Mae"), which remains a government corporation, and privatizing Fannie Mae.

Freddie Mac was established by Congress in 1970 as a private corporation to compete with Fannie Mae, and its charter describes similar purposes.  See 12 U.S.C. § 1451 note.[*]

Fannie Mae and Freddie Mac carry out their missions by purchasing mortgages originated by third-party lenders, pooling the mortgages into investment instruments, and selling those mortgage-backed securities to raise capital for further purchases.  By providing capital to lenders, these activities promote access to mortgage credit throughout the Nation and stabilize the secondary market for residential mortgages.

Congress has exempted Fannie Mae and Freddie Mac generally from state and local taxes, "except that any real property of [either Fannie Mae or Freddie Mac] shall be subject to State, territorial, county, municipal, or local taxation to the same extent as other real property is taxed."  12 U.S.C. §

---

[*] During the financial crisis of 2008, Congress created the Federal Housing Finance Agency ("FHFA") to provide "general regulatory authority" over Fannie Mae and Freddie Mac.  12 U.S.C. § 4511.  On September 6, 2008, FHFA imposed itself as the conservator over Fannie Mae and Freddie Mac, thus stepping into their shoes.  See id. § 4617.  As conservator of Fannie Mae and Freddie Mac, FHFA is also a party to these cases.

1723a(c)(2) (as to Fannie Mae); see also id. § 1452(e) (as to Freddie Mac); id. § 4617(j)(2) (as to the FHFA).

Maryland and South Carolina, as well as many other states, impose taxes on the ownership of real property, as well as excise taxes on the transfer of real property.

Maryland's property tax is imposed annually on owners of real property located in the State, based on the assessed value of the property. See Md. Code Ann., Tax-Prop. §§ 5-102(a), 6-101(a), 6-201(a). In addition, Maryland imposes a recordation tax on "instrument[s] of writing" (e.g., deeds, leases, and mortgages) that are recorded with the clerk of a circuit court, as well as a transfer tax on the same "instrument[s] of writing." See id. §§ 12-102, 13-202. The amount of the recordation and transfer taxes are based on the "consideration" paid for the real property or the principal amount of debt secured. See id. §§ 12-103, 13-203. Maryland also authorizes counties to impose transfer taxes, which, for example, Montgomery County has done. See id. § 13-402.1; Montgomery County Code § 52-19 et seq.

South Carolina similarly imposes an annual tax on the ownership of real property located in the State, based on its assessed valuation. See S.C. Code Ann. §§ 12-37-30, 12-37-210, 12-37-610. In addition, South Carolina imposes "recording fees" "for the privilege of recording deeds in which land . . . is

7

transferred to another person." Id. § 12-24-10(A). As with Maryland, the rate for the recording fees in South Carolina is based on the "consideration paid or to be paid" for the real property or for the debts recorded. Id. § 12-24-30(A).

In the course of their business, Fannie Mae and Freddie Mac acquired real property in both Maryland and South Carolina through foreclosures on mortgages that they owned or guaranteed. When selling these properties to third persons, they refused to pay the transfer taxes and recording fees, claiming to be exempt from them under 12 U.S.C. §§ 1723a(c)(2) and 1452(e), respectively. The Maryland and South Carolina counties, which collect these taxes, disputed Fannie Mae and Freddie Mac's claimed exemptions, contending that the exemptions did not cover state and local transfer taxes, including recording fees, insofar as they related to real property, and they commenced these actions (one in Maryland and two in South Carolina) for a declaratory judgment that Fannie Mae and Freddie Mac are liable for transfer taxes and recording fees and to recover as damages the taxes and fees that they refused to pay. The FHFA, as conservator of Fannie Mae and Freddie Mac, was also named a defendant in the Maryland case and intervened as a defendant in the South Carolina cases.

The South Carolina district court consolidated the two actions pending there and certified the consolidated action as a

class action, defining the class as all counties in South Carolina. The court thereafter rejected the counties' claims on the merits, concluding that the exclusion from the general tax exemptions covered only real property taxes and not transfer taxes. The court also rejected the South Carolina counties' claim that the tax exemptions were unconstitutional. The Maryland district court did not reach the class action certification question but dismissed the Maryland county's claims as a matter of law, again concluding that the exclusion from the general tax exemptions did not apply and that the exemptions themselves were a constitutional exercise of Congress's Commerce Clause power.

These appeals followed, and we ordered that they be consolidated for our review.

II

The general tax exemptions for Fannie Mae and Freddie Mac exclude state and local taxes on their "real property" "to the same extent as other real property is taxed." 12 U.S.C. § 1723a(c)(2); id. § 1452(e). The Counties argue that "real property," as used in the statutes, includes deeds to the property recorded by Fannie Mae and Freddie Mac because "deeds are 'indispensable' to ownership of real property; they are the principal evidence of ownership and true title." The Counties

9

reason that such a construction follows from the concept that real property ownership is a "bundle of sticks" that includes the right to transfer title. Consequently, by their account, a real property transfer tax is a tax on real property, which is excluded from the general tax exemptions provided for Fannie Mae and Freddie Mac.

Thus, according to the Counties, when a statute refers to a real property tax, it is also referring to transfer taxes. Such a blur of the two taxes would mean analogously that any reference to a personal property tax (a tax on the ownership of personal property) must also be a reference to sales taxes imposed on the transfer of personal property. Yet, every legal and common understanding distinguishes a property tax from a transfer or sales tax.

The Supreme Court made this very point clear when it stated that a property tax is "levied upon the property itself," whereas a transfer tax is levied upon the "transfer of property." United States v. Wells Fargo Bank, 485 U.S. 351, 355 (1988). The Court explained:

> [A]n exemption of property from all taxation ha[s] an understood meeting: the property [is] exempt from direct taxation, but certain privileges of ownership, such as the right to transfer the property, [can] be taxed. Underlying this doctrine is the distinction between an excise tax, which is levied upon the use or transfer of property even though it might be measured by the property's value, and a tax levied upon the property itself.

10

Id. at 355.  Thus, the exemption from a tax on real property was not an exemption from a tax on "certain privileges of ownership, such as the right to transfer [real] property."  Id.

When that distinction is recognized, it becomes apparent that the exclusions allowing for the taxation of real property as "other real property is taxed," 12 U.S.C. §§ 1723a(c)(2), 1452(e), undoubtedly refer to real property taxes imposed on the ownership of real property and not to transfer taxes imposed on the transfer of real property -- e.g., on the sale of real property.

The Supreme Court applied the same distinction in Pittman v. Home Owners' Loan Corp., 308 U.S. 21 (1939).  In Pittman, the Court considered whether Maryland could impose a mortgage-recordation tax on the Home Owners' Loan Corporation.  That corporation was subject to a statutory tax exemption with a real property exclusion materially identical to the ones in the present case.  See id. at 31 n.3.  The Court found that the corporation was exempt from the recordation tax, which necessarily meant that the real property exclusion did not apply to the recordation tax.  Id. at 33.

The transfer taxes in the present case are analogous to the recordation tax in Pittman, and both are distinct from property taxes.  See also Fed. Land Bank v. Bismarck Lumber Co., 314 U.S. 95, 101 (1941) ("Obviously a tax upon the sale of building

11

materials to be used on the real estate of a federal land bank is not a tax upon that real estate"); Southern Ry. Co. v. Watts, 260 U.S. 519, 530 (1923) ("[A] privilege tax is not converted into a property tax because it is measured by the value of property").

Moreover, the South Carolina and Maryland statutory schemes themselves confirm the divide between excise taxes and property taxes. Both States, in addition to imposing a tax on the transfer of real property, impose a separate direct tax on real property, using the same "subject to" language used in the federal exemption statutes. Compare Md. Code Ann., Tax-Prop. § 6-101 ("[A]ll property located in [Maryland] is subject to . . . property tax" (emphasis added)), and S.C. Code Ann. § 12-37-210 ("All real . . . property in [South Carolina] . . . shall be subject to taxation" (emphasis added)), with 12 U.S.C. § 1452(e) (excluding from the general taxation exemption "any real property . . . subject to State . . . or local taxation to the same extent according to its value as other real property is taxed" (emphasis added)), and 12 U.S.C. § 1723a(c)(2) (similarly using "subject to" language).

In sum, we hold that the real property exclusions from the general tax exemptions of 12 U.S.C. §§ 1723a(c)(2) and 1452(e) do not include transfer and recordation taxes. Accord DeKalb Cnty. v. Fed. Hous. Fin. Agency, __ F.3d __, 2013 U.S. App.

12

LEXIS 25763 (7th Cir. Dec. 23, 2013); Cnty. of Oakland v. Fed. Hous. Fin. Agency, 716 F.3d 935, 939 n.6 (6th Cir. 2013).

III

The Counties contend that, in any event, Congress acted impermissibly in providing Fannie Mae and Freddie Mac with exemptions from state and local transfer taxes. Disputing the district courts' conclusion that the exemptions were justified under the Commerce Clause, the Counties assert that the transfer taxes were "assessed on local, intrastate activity -- the buying and selling of parcels of real estate," and therefore any efforts to regulate them were not justified by the Commerce Clause but instead amounted to nothing less than an infringement on the States' sovereign power to tax -- a power "indispensable to their existence." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 199 (1824); see also Bode v. Barrett, 344 U.S. 583, 585 (1953) (observing that the power of a State to tax is "basic to its sovereignty"); Dows v. City of Chicago, 78 U.S. (11 Wall.) 108, 110 (1871) ("It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments").

A

Before addressing the Counties' Commerce Clause argument, we address the Counties' contention that we should review

13

Congress's authority to exempt Fannie Mae and Freddie Mac from state and local taxes under the strict-scrutiny standard of review. They argue that the "rights of the states to . . . impose taxes are just as fundamental, from a Constitutional standpoint, as the rights of individuals to Due Process and Equal Protection under the Fifth and Fourteenth Amendments." The Counties provide no authority for this position, though, candidly observing, "The admitted absence of judicial standards for limiting Congressional interference with non-discriminatory state taxes is no proper reason to apply a wrong standard or not formulate a proper one."

We need not, however, formulate a new standard, as it is established that for a federal statute to pass constitutional muster under the Commerce Clause, there need only exist a "'rational basis' . . . for . . . concluding" that the regulated activities "taken in the aggregate, substantially affect interstate commerce." Gonzales v. Raich, 545 U.S. 1, 22 (2005) (emphasis added); see also Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276 (1981) ("The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding"); United

14

States v. Gibert, 677 F.3d 613, 621 (4th Cir. 2012) ("[I]f a 'rational basis exist[s] for concluding that a regulated activity sufficiently affect[s] interstate commerce,' then a challenge to Congress' power under the Commerce Clause to regulate that activity must fail" (alterations in original) (quoting United States v. Lopez, 514 U.S. 549, 557 (1995))).

And this level of scrutiny is not altered because a regulation exempts an entity from state taxation. The Counties' analogy to the Fifth and Fourteenth Amendments fails because there is no independent constitutional protection for the States' right to tax. To be sure, Congress must speak clearly when preempting a State's traditional powers, including the power to tax. See Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 345 (1994). But Congress's intent to exempt Fannie Mae and Freddie Mac from state taxation in the present case could not be clearer -- the statutes provide that Fannie Mae and Freddie Mac "shall be exempt from all taxation now or hereafter imposed by any State . . . or by any county." 12 U.S.C. § 1723a(c)(2); id. § 1452(e). The Supreme Court has often recognized Congress's power to exempt entities from state taxation, but it has never indicated that such an exercise of power would be subject to strict scrutiny. See, e.g., Ariz. Dep't of Revenue v. Blaze Constr. Co., 526 U.S. 32, 38 (1999) ("Whether to exempt [the government contractor] from Arizona's

15

transaction privilege tax . . . rests . . . with Congress"); United States v. New Mexico, 455 U.S. 720, 737 (1988) ("If the [tax] immunity of federal contractors is to be expanded beyond its narrow constitutional limits, it is Congress that must take responsibility for the decision"); United States v. City of Detroit, 355 U.S. 466, 474 (1958) ("[T]his is not to say that Congress, acting within the proper scope of its power, cannot confer [tax] immunity by statute where it does not exist constitutionally").  And more particularly, in Arizona Public Service Co. v. Snead, 441 U.S. 141 (1979), the Court upheld a federal law invalidating a discriminatory New Mexico tax on the transmission of electricity where "Congress had a rational basis for finding that the New Mexico tax interfered with interstate commerce, and selected a reasonable method to eliminate that interference."  Id. at 149-50.  While Snead was a dormant Commerce Clause case, the Court's employment of the rational-basis standard of review nonetheless undermines the Counties' claim that state taxes are deserving of heightened protection.

In the absence of a particular constitutional right that would trigger heightened scrutiny, we hold that a congressional exemption from state taxation under the Commerce Clause is subject to rational-basis review.

B

On the merits, the Counties contend that the Commerce Clause does not authorize Congress to regulate local, intrastate activity, such as collecting taxes on "the buying and selling of parcels of real estate," and therefore, they argue, the district courts erred in holding that Congress could reasonably conclude that state and local taxation would interfere with the stated missions of Fannie Mae and Freddie Mac.  See Butts v. Fed. Nat'l Mortg. Ass'n, No. 9:12-1912, 2013 U.S. Dist. LEXIS 124999, at *24-25 (D.S.C. May 23, 2013) ("Congress created Fannie Mae and Freddie Mac to provide stability and competition in the national secondary mortgage market.  Congress could reasonably conclude that requiring Fannie Mae and Freddie Mac to pay certain state taxes, such as the South Carolina recording fee, could interfere with that important mission"); Montgomery Cnty. v. Fed. Nat'l Mortg. Ass'n, No. DKC-13-0066, 2013 U.S. Dist. LEXIS 61822, at *44-45 (D. Md. Apr. 30, 2013) (concluding that there is "a rational basis for Congress to conclude that the regulated activity in question . . . has a substantial economic effect on interstate commerce" and that it was reasonable for Congress to believe that "any taxation of [Fannie Mae and Freddie Mac] by states and localities could interfere with their stated missions").

17

Congress has the power to "'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States.'" Raich, 545 U.S. at 22 (omission in original) (quoting U.S. Const., Art. I, § 8). The Supreme Court has identified three forms of regulation that are authorized by the Commerce Clause: (1) "Congress can regulate the channels of interstate commerce"; (2) "Congress has authority to regulate and protect the instrumentalities of interstate commerce"; and (3) "Congress has the power to regulate activities that substantially affect interstate commerce." Id. at 16-17 (emphasis added). Moreover, "when Congress enacts a general statutory framework regulating economic activity, its power is not limited to the regulation only of interstate economic activity, but extends to the regulation of purely intrastate economic activity as well." Brzonkala v. Va. Polytechnic Inst. & State Univ., 169 F.3d 820, 835 (4th Cir. 1999) (en banc) (emphasis omitted), aff'd sub nom. United States v. Morrison, 529 U.S. 598 (2000).

In this case, the overall statutory schemes establishing Fannie Mae and Freddie Mac are clearly directed at the regulation of interstate economic activity. Congress created the corporations to "promote access to mortgage credit throughout the Nation" and to foster a nationwide secondary mortgage market. 12 U.S.C. § 1716 (with respect to Fannie Mae);

18

id. § 1451 note (with respect to Freddie Mac). One need only recall the effects on the national economy that the 2008 failure of mortgage markets had in order to recognize that the regulation and stabilization of those markets lie at the core of the Nation's interest in promoting and maintaining a vital economy. And at oral argument, the Counties rightly conceded that Congress acted well within its Commerce Clause power in establishing Fannie Mae and Freddie Mac for the purposes indicated in their charters. The relevant inquiry, then, is whether the statutory exemptions from state and local taxes are necessary and proper to Congress's legitimate exercise of its Commerce Clause power. See Raich, 545 U.S. at 34-35 (Scalia, J., concurring) (explaining that the authority to regulate intrastate commerce "derives from the Necessary and Proper Clause").

"[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." United States v. Comstock, 560 U.S. 126, 134 (2010). "[T]he word 'necessary' does not mean 'absolutely necessary.'" Id. (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 413-15 (1819)). Rather, "the relevant inquiry is simply 'whether the means chosen are reasonably

19

adapted to the attainment of a legitimate end under the commerce power.'" Id. at 135 (quoting Raich, 545 U.S. at 37 (Scalia, J., concurring) (internal quotation marks omitted)).

We conclude that Congress could rationally have believed that state taxation would substantially interfere with or obstruct the legitimate purposes of Fannie Mae and Freddie Mac of regulating and stabilizing the secondary mortgage market. And we conclude further that its decision to exempt Fannie Mae and Freddie Mac from most state taxation was a reasonable means of avoiding that risk of interference or obstruction. First, excessive state taxation of Fannie Mae and Freddie Mac could undermine their ability to purchase mortgages by reducing their access to capital. Second, exposure to state taxation would subject Fannie Mae and Freddie Mac to inconsistencies in transaction costs that would vary from state to state. Such a patchwork might undermine the goal of providing mortgage liquidity to all parts of the country. See, e.g., 12 U.S.C. § 1716(4) (declaring that Fannie Mae should "promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas)" (emphasis added)). In particular, inconsistent state taxation could discourage Fannie Mae and Freddie Mac from investing in mortgages on real property in states with the highest taxes. Third, absent the statutory exemptions, states might be tempted to target Fannie Mae and

20

Freddie Mac with large taxes, given the sheer volume of their mortgage portfolios and their statutory obligations to continue purchasing and guaranteeing mortgages throughout the country. And this problem could become particularly pronounced were a State to face a mortgage crisis. For these reasons, we agree with the district courts that Congress could rationally have believed that insulating Fannie Mae and Freddie Mac from most state taxation would substantially further those entities' purposes. Thus, we hold that the statutory exemptions are valid exercises of Congress's constitutional powers.

The Counties argue that Morrison and Lopez, two Commerce Clause cases, suggest the opposite result, asserting that the transfer taxes here are completely localized and "no more commercial in nature than the activities" that Congress was attempting to regulate in those cases because "[t]axes are not commerce between or among the States." In Morrison, the Supreme Court struck down a federal statute that imposed a civil penalty for gender-motivated violence, 529 U.S. at 601-02, and in Lopez, the Court struck down a federal statute that criminalized possession of a firearm in a school zone, 514 U.S. at 551. In both of those cases, the object of Congress's regulation was intrastate, non-economic activity. See Morrison, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity"); Lopez, 514 U.S. at 561

21

("[The statute] has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms"). In contrast, the ultimate goals of the statutory scheme at issue in this case are to stabilize the secondary mortgage market and to promote liquidity in that market, which are quintessentially interstate and economic aims. While local transfer and recordation taxes might, in a vacuum, appear to be purely intrastate in nature, Congress could rationally have believed that such taxes would substantially affect interstate commerce by burdening Fannie Mae and Freddie Mac. See Wickard v. Filburn, 317 U.S. 111, 124 (1942) ("[N]o form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power" (quoting United States v. Wrightwood Dairy Co., 315 U.S. 110, 119 (1942)) (internal quotation marks omitted)).

Thus, we conclude that Congress may exempt Fannie Mae and Freddie Mac from state and local transfer taxes, even though they are collected in the context of intrastate transactions, because the taxes could substantially interfere with or obstruct the constitutionally justified missions of Fannie Mae and Freddie Mac in bolstering the secondary mortgage market.

C

The Counties' remaining arguments for finding the statutory tax exemptions unconstitutional do not merit extensive discussion.

First, they argue that the statutory exemptions inappropriately "commandeer" state employees by requiring them "to record deeds from [Fannie Mae and Freddie Mac] free of charge." See Printz v. United States, 521 U.S. 898 (1997); New York v. United States, 505 U.S. 144 (1992). The federal statutes in question, however, do not impose upon the states or local officers any affirmative obligation. See United States v. Bostic, 168 F.3d 718, 724 (4th Cir. 1999) (rejecting a commandeering argument in the absence of an affirmative obligation). Surely, South Carolina and Maryland could scrap their title recording systems if they so desired. The mere fact that federal statutes give rise to state action does not amount to commandeering. See South Carolina v. Baker, 485 U.S. 505, 514 (1988) ("Any federal regulation demands compliance").

Second, the Counties argue that Fannie Mae and Freddie Mac are not federal instrumentalities entitled to immunity from state taxation, implying that Congress may only statutorily exempt federal instrumentalities from taxation. But such an argument makes little sense because, absent waiver, federal instrumentalities are immune from state taxation under the

23

Supremacy Clause of the Constitution, regardless of statutory enactment. See New Mexico, 455 U.S. at 735; McCulloch, 17 U.S. at 436. Moreover, the Supreme Court has repeatedly stated that Congress may grant statutory tax immunity broader than what the Supremacy Clause would otherwise provide. See Blaze Constr. Co., Inc., 526 U.S. at 38; New Mexico, 455 U.S. at 737; City of Detroit, 355 U.S. at 474. The case of First Agricultural National Bank v. Tax Commission, 392 U.S. 339 (1968), makes clear that constitutional and statutory tax exemptions are distinct concepts. In First Agricultural, the Supreme Court held that a national bank had been statutorily exempted from a state tax, which made it "unnecessary to reach the constitutional question of whether . . . national banks should be considered nontaxable as federal instrumentalities." Id. at 341. Because Congress may provide for immunity from state taxation irrespective of an entity's status as a federal instrumentality and because Congress has done so in the present case, it is unnecessary to address whether Fannie Mae and Freddie Mac indeed qualify as federal instrumentalities.

Third and finally, the Counties argue that the statutory exemptions violate the Tenth Amendment. To be sure, the Tenth Amendment reserves to the States powers not granted to Congress. But because we hold today that Congress acted within its Commerce Clause power in granting Fannie Mae and Freddie Mac

24

statutory tax exemptions, the Tenth Amendment is inapplicable. See New York, 505 U.S. at 156 ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States").

Accordingly, the judgments of the district courts are

AFFIRMED.