# United States Court of Appeals
## For the First Circuit

---

No. 13-2034

TOWN OF JOHNSTON, on behalf of itself and all others
similarly situated,

Plaintiff, Appellant,

v.

FEDERAL HOUSING FINANCE AGENCY, As Conservator for Federal
Mortgage and Federal Home Loan Mortgage, et al.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux,  U.S. District Judge]

---

No. 13-2116

COMMISSIONERS OF BRISTOL COUNTY,

Plaintiffs, Appellants,

v.

FEDERAL HOME LOAN MORTGAGE CORPORATION, a Federal Chartered
Corporation, et al.,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton,  U.S. District Judge]

---

Before

Howard and Kayatta, <u>Circuit Judges</u>,
and McCafferty,[*] <u>District Judge</u>.

---

<u>Warren T. Burns</u>, with whom <u>Terrell W. Oxford</u> and <u>Susman Godfrey, LLP</u> were on brief, for appellant Town of Johnston.

<u>John Roddy</u>, <u>Elizabeth Ryan</u>, <u>Baily & Glasser LLP</u>, <u>Steven P. Sabra</u> and <u>Sabra and Aspden, P.A.</u> on brief for appellants Commissioners of Bristol County.

<u>Michael A.F. Johnson</u>, with whom <u>Howard N. Cayne</u>, <u>Asim Varma</u>, <u>Dirk C. Phillips</u>, <u>Arnold & Porter LLP</u>, <u>Michael J. Ciatti</u>, <u>Merritt E. McAlister</u>, <u>King & Spalding LLP</u>, <u>Michael D. Leffel</u>, <u>Jill L. Nicholson</u> and <u>Foley & Lardner LLP</u> were on brief, for appellees.

<u>Patrick J. Urda</u>, Tax Division, Department of Justice, with whom <u>Kathryn Keneally</u>, Assistant Attorney General, <u>Tamara W. Ashford</u>, Principal Deputy Assistant Attorney General, <u>Gilbert S. Rothenberg</u>, Chief, Appellate Section and <u>Jonathan S. Cohen</u>, Attorney, Tax Division, Department of Justice, were on brief for intervenor United States.

---

August 27, 2014

---

---

[*] Of the District of New Hampshire, sitting by designation.

**HOWARD, Circuit Judge**.  The Town of Johnston, Rhode Island and the Commissioners of Bristol County, Massachusetts ("the municipalities") brought separate actions against the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Housing Finance Agency ("FHFA") (collectively, "the entities"), alleging that the entities failed to pay taxes on the transfer of property. Federal district courts in Massachusetts and Rhode Island granted the entities' motions to dismiss based on statutory exemptions from taxation.  The municipalities appeal the district courts' decisions, claiming that the transfer tax is a tax on "real property" and therefore falls outside the entities' tax exemptions, and that the entities' tax exemptions themselves are unconstitutional.  We affirm the dismissals of both complaints for failure to state a claim.

## I. Background

Fannie Mae and Freddie Mac are private, publicly traded corporations that were created by federal charter to support the development of the secondary mortgage market.  In September 2008, the two corporations entered conservatorship under the FHFA, an independent federal agency, pursuant to the Housing and Economic Recovery Act of 2008.  12 U.S.C. § 4501.  As  conservator, the FHFA succeeded to all rights, obligations, and privileges of the two corporations.

The charters of Fannie Mae and Freddie Mac contain similar exemptions concerning taxation (the "Charter Exemptions"). Both are exempt from "all taxation" imposed by any state, county, or local taxing authority, "except that any real property of the corporation shall be subject to State, territorial, county, municipal, or local taxation to the same extent . . . as other real property is taxed."  See 12 U.S.C. §§ 1723a(c)(2) (Fannie Mae), 1452(e) (Freddie Mac).  The FHFA has an essentially identical tax exemption.  See id. § 4617(j)(2).

Massachusetts and Rhode Island each tax the transfer of real estate.  See Mass. Gen. Laws ch. 64D, §§ 1-3; R.I. Gen. Laws § 44-25-1.  The Massachusetts real property transfer tax is an excise tax "for and in respect of the deeds, instruments and writings" or the materials upon which they are written.  Mass. Gen. Laws ch. 64D, § 1.  The rate of the tax depends on the county in which the real property is located, and the total tax imposed is a function of the sale price of the property.  The Bristol County Commissioners are responsible for collecting this transfer tax within their county, and do so through the Bristol County Register of Deeds.  Similarly, the Rhode Island transfer tax is imposed "on each deed, instrument, or writing" used to transfer real estate. R. I. Gen. Laws § 44-25-1.  This transfer tax is also determined by the purchase price of the property and is collected by the municipality in which the deed is recorded.

-4-

As is the case throughout the country, a significant number of mortgaged properties in the municipalities have gone into foreclosure since the 2008 financial crisis. Through the foreclosure process, the entities have taken possession of many of these properties and then sold them to third-party purchasers. The entities have not paid any state taxes related to the transfer of the properties.

In their separate actions, the municipalities sought declaratory judgments that the entities owe the respective transfer taxes, as well as money damages and equitable relief to recover the unpaid taxes, plus interest and costs. The district courts granted the entities' Rule 12(b)(6) motions to dismiss, and the municipalities appealed.

## II. Analysis

The municipalities argue on appeal that their claims were erroneously dismissed, because (1) a real property exception in the Charter Exemptions applies to the transfer taxes and (2) the Charter Exemptions are unconstitutional.

### a. Real Property Exception

The Charter Exemptions excuse the entities from paying all state and local taxes except for taxes on the entities' real property, which is taxed at the same rate as real property generally. See 12 U.S.C. §§ 1723a(c)(2) (Fannie Mae), 1452(e) (Freddie Mac), 4617(j)(2) (FHFA). The municipalities claim that

the transfer taxes are taxes on real property and thus fit within the real property exception.  The entities disagree.  We review this question of statutory interpretation de novo.  United States v. Jimenez, 507 F.3d 13, 19 (1st Cir. 2007).

The municipalities claim that the transfer tax is a tax on real property because, they argue, real property includes deeds and the transfer process in addition to the physical premises.  The municipalities draw on the "common idiom describ[ing] property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property."  United States v. Craft, 535 U.S. 274, 278 (2002).  They argue that one of these "sticks" is the right to transfer property and that a tax on the transfer of property is therefore a tax on real property.  The municipalities claim that we should read the real estate exception broadly because "taxation is the rule and exemption the exception."  Gagne v. Hanover Water Works Co., 92 F.2d 659, 661 (1st Cir. 1937).

We do not write on a clean slate.  Six other circuits have recently considered this attempt to shoe-horn a transfer tax into a real property tax, and they have unanimously rejected the

argument.[1]  We join the other circuits, adding only two brief observations of our own.

First, while the ability to transfer property properly may be viewed as part of the bundle of rights that comes with property ownership, the transfer tax is not imposed merely because a person has the ability to transfer property.  Rather, the tax must be paid only when property is actually transferred.  The Supreme Court has recognized a longstanding and clear "distinction between an excise tax, which is levied upon the use or transfer of property even though it might be measured by the property's value, and a tax levied upon the property itself."  United States v. Wells Fargo Bank, 485 U.S. 351, 355 (1988).

Second, this distinction between direct taxes on real property and indirect taxes is reflected in both Massachusetts and Rhode Island law.  Direct taxes on real property, see Mass. Gen. Laws ch. 59, § 2;[2] R.I. Gen. Laws § 44-3-1, are codified separately

---

[1] See, e.g., Delaware Cnty., Pa. v. Fed. Hous. Fin. Agency, 747 F.3d 215, 223-24 (3d Cir. 2014); Montgomery Cnty., Md. v. Fed. Nat. Mortgage Ass'n, 740 F.3d 914, 920 (4th Cir. 2014); Bd. of Comm'rs of Montgomery Cnty. v. Fed. Hous. Fin. Agency, No. 13-4429, 2014 WL 3360830, *4 (6th Cir. July 10, 2014); Hennepin Cnty. v. Fannie Mae, 742 F.3d 818, 822 (8th Cir. 2014); Bd. of Cnty. Comm'rs of Kay Cnty v. Fed. Hous. Fin. Agency, 754 F.3d 1025, 1030 (D.C. Cir. 2014); DeKalb Cnty. v. Fed. Hous. Fin. Agency, 741 F.3d 795, 801 (7th Cir. 2013).

[2] Massachusetts law further defines "real property" for purposes of taxation to "include all land within the commonwealth and all buildings and other things thereon or affixed thereto, unless otherwise exempted from taxation under other provisions of law." Mass. Gen. Laws ch. 59, § 2(a).

from transfer taxes, which are taxes specifically on the deeds or writings used to transfer property, see Mass. Gen. Laws ch 64D, § 1; R.I. Gen. Laws § 44-25-1(a). Given the longstanding distinction between a direct tax on real property and an excise tax, and the fact that the transfer taxes are plainly excise taxes triggered by the act of transferring property, we hold that the transfer taxes are not included in the real property exception to the Charter Exemptions from taxation.

### b. Constitutionality of Charter Exemptions

The municipalities also challenge the constitutionality of the Charter Exemptions, arguing that they exceed the bounds of Congress' power under the Commerce Clause and violate the Tenth Amendment. We review the municipalities' constitutional challenge to the Charter Exemptions de novo. United States v. Coccia, 446 F.3d 233, 242 (2006).

Our inquiry into whether a statute is justified under the Commerce Clause is a narrow one. Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc., 452 U.S. 264, 276 (1981). So long as there is a rational basis for Congress to have found that a regulated activity affects interstate commerce and the means of regulation are reasonably adapted to that end, we must defer to that finding. Id.; see also Gonzales v. Raich, 545 U.S. 1, 22 (2005); Heart of Atlanta Motel v. United States, 379 U.S. 241, 258, 262 (1964). The municipalities nonetheless urge us to apply strict

-8-

scrutiny rather than rational basis review in analyzing the entities' Charter Exemptions. They argue that strict scrutiny is appropriate because a state's ability to tax is essential to the state's status as a sovereign entity.

As the municipalities necessarily concede, there is no precedent in favor of this wishful argument. While a state's ability to tax is certainly an essential attribute, it is treated no differently than other areas of conflict between state and federal authority. "[L]ike all the other concurrent powers of the States, this power of taxation is subject, in its exercise, to that general implied restriction which necessarily results from the supreme and paramount authority of the Union." Brown v. Maryland, 25 U.S. 419, 421 (1827). The district courts saw no reason to depart from a rational basis analysis, and neither do we. Accord Delaware Cnty., 747 F.3d at 224-26; Montgomery Cnty., 740 F.3d at 922.

On the merits, the municipalities argue primarily that the exemptions do not fall within Congress' powers under the Commerce Clause.

The Constitution grants Congress the power "[t]o make all [l]aws which shall be necessary and proper for carrying into [e]xecution" Congress' enumerated powers, U.S. Const. art. I, § 8, cl. 18. These include the power "[t]o regulate [c]ommerce with foreign [n]ations, and among the several States . . . ." Id. at

cl. 3. Congress' power over interstate commerce "extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." United States v. Darby, 312 U.S. 100, 118 (1941).

The municipalities attempt to narrowly sight the analytical lens, arguing that we should focus on the fact that the transfer taxes, on their own, are intrastate and non-commercial and therefore cannot be regulated under the Commerce Clause. We, however, do not consider the transfer taxes in a vacuum, but rather as part of Congress' broader regulatory scheme aimed at the development of a robust secondary mortgage market through Fannie Mae and Freddie Mac. The proper question for purposes of the Commerce Clause analysis is not whether the transfer taxes themselves affect interstate commerce, but rather whether Congress had a rational basis for believing that exempting the entities from paying the transfer taxes would affect interstate commerce. The answer to this question is an unequivocal yes.

If the mission of the entities as detailed in their charters is not at the heart of interstate commerce, it surely resides in one of the main arteries. Fannie Mae was created by Congress to "establish secondary market facilities for residential mortgages" and to "provide stability in the secondary market for

residential mortgages," acts of financing and market-development that are indisputably commercial. 12 U.S.C. § 1716. The goal was one of "promot[ing] access to mortgage credit throughout the Nation." Id. Similarly, Freddie Mac was created to enhance competition in the secondary mortgage market, to "provide ongoing assistance to the secondary market for residential mortgages," to increase the availability of "mortgages on housing for low- and moderate-income families," and, once again, to "promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1451 note. Congress could easily have determined that local taxes on the transfer of real property would impede the entities' mission, for example by reducing the availability of capital that would otherwise be used to purchase mortgages or by diverting the entities' investments away from higher-tax states and thereby limiting their national mission. Accord Montgomery, 750 F.3d at 924. Congress' decision to exempt the entities from various state and local taxes is therefore rationally related to Congress' desire to have the entities be as effective as possible in carrying out their purpose. The municipalities' primary argument fails.

In addition to their main constitutional challenge, the municipalities also offer subsidiary arguments. For one, they question whether the entities are federal instrumentalities, and therefore whether the entities are entitled to the automatic constitutional immunity from state and local taxation enjoyed by

the federal government and institutions acting as federal instrumentalities.[3] This focus on whether the entities are federal instrumentalities is off-target. Private entities may be shielded from paying a state tax by either "constitutional immunity or congressional exemption." Arizona Dept. of Revenue v. Blaze Const. Co., Inc., 526 U.S. 32, 36 (1999). Where, as here, the tax exemption is statutory, status as a federal instrumentality is not necessary. As in First Agricultural National Bank v. State Tax Commission, 392 U.S. 339, 341 (1968), we need not determine whether the entities are federal instrumentalities entitled to automatic constitutional immunity from state taxes because Congress has passed legislation explicitly exempting the entities from taxation. Accord Delaware Cnty. 747 F.3d at 228, n. 4; Bd. of Cnty. Comm'rs of Montgomery Cnty., 2014 WL 3360830, *7 n.4; DeKalb Cnty., 741 F.3d at 802.

The municipalities also advance two arguments based on the Tenth Amendment. First, they argue that preventing them from collecting the transfer tax when a property is transferred, yet still expecting them to register deeds, is tantamount to unconstitutionally commandeering local services. See, e.g., New York v. United States, 505 U.S. 144 (1992). This argument is

_____

[3] "[A] [s]tate may not, consistent with the Supremacy Clause, U.S. Const., Art. VI, cl. 2, lay a tax 'directly upon the United States.'" United States v. New Mexico, 455 U.S. 720, 733 (1982) (quoting Mayo v. United States, 319 U.S. 441, 447 (1943)).

-12-

misguided.  Whereas the anti-commandeering cases concern the federal government's requiring a state to take particular types of affirmative action, see id. at 162 (rejecting the federal government's attempt to require a state legislature to enact a particular law); Printz v. United States, 521 U.S. 898, 935 (1997) (rejecting the federal government's conscripting state officers to administer or enforce a federal regulatory program), the subject tax exemptions only require the state to refrain from imposing taxes on the entities.  They are not addressed to the state process of registering deeds.  The mere fact that the Charter Exemptions interfere with what the states otherwise would do--here, impose a tax--is not an obstacle under the Tenth Amendment.  The Supreme Court has noted that "[a]ny federal regulation demands compliance," and merely requiring a state to comply with a federal law does not present a constitutional defect. South Carolina v. Baker, 485 U.S. 505, 514-15 (1988).

Finally, the municipalities argue more broadly that the Charter Exemptions violate the general principles of federalism enshrined in the Tenth Amendment.  We have "no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under the Commerce Clause." Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 550 (1985).  Having concluded that the Charter Exemptions are a constitutional exercise of Congress' power under the Commerce Clause, we necessarily must

also conclude that the municipalities' efforts to invoke abstract principles of federalism through the Tenth Amendment fail. <u>See</u> <u>New York</u>, 505 U.S. at 155-56 ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States.").

**III. Conclusion**

For the above reasons, we **affirm** the dismissal of all claims.