# United States Court of Appeals
## For the First Circuit

No. 15-1487

MS. S., individually and
as parent and legal guardian of B.S., a minor,

Plaintiff, Appellant,

v.

REGIONAL SCHOOL UNIT 72,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

Richard L. O'Meara, with whom Stacey D. Neumann, Caroline J.
Jova, and Murray, Plumb & Murray were on brief, for appellant.
Eric R. Herlan, with whom Hannah E. King and Drummond Woodsum
& MacMahon were on brief, for appellee.

July 15, 2016

**LIPEZ**, **Circuit Judge**.  This case concerns two separate, but ultimately intertwining, narratives.  The first is that of appellant, Ms. S., her son, B.S., and his right to a free appropriate public education ("FAPE") under the federal Individuals with Disabilities Education Act ("IDEA").  The second concerns the implementation of a Maine regulation -- referred to herein as the "filing limitation" -- that determines how much time a parent, such as Ms. S., has to request a due process hearing alleging an IDEA violation.

In May 2013, Ms. S. filed a request for a due process hearing with the Maine Department of Education ("MDOE") concerning alleged IDEA violations in all of B.S.'s ninth (2009–2010), tenth (2010-2011), eleventh (2011-2012), and twelfth (2012-2013) grade years.  The hearing officer dismissed the claims that arose during B.S.'s ninth and tenth grades as time barred because the filing limitation allowed only claims brought within two years of when the parent knew or should have known of a violation.  Ms. S. sought judicial review in the district court, arguing that the hearing officer should not have dismissed the ninth and tenth grade claims because the two-year filing limitation was not promulgated in compliance with the Maine Administrative Procedure Act ("Maine APA" or "MAPA") and is therefore void and of no legal effect.  The district court determined that the two-year filing limitation was valid, Ms. S. did not qualify for an exception to the limitation

period, and B.S. received a FAPE in the eleventh and twelfth grades. Ms. S.'s timely appeal followed.

We conclude that the district court erred in its analysis of the validity of the two-year filing limitation, and, further, that the record before us is insufficient to determine whether the MDOE adequately complied with MAPA procedures when adopting the two-year filing limitation. Given that conclusion, we do not reach the question of whether an exception to the filing limitation applies here. However, we do find that, consistent with the district court's judgment, B.S. received a FAPE in the eleventh and twelfth grades. We therefore vacate and remand in part, and affirm in part.

## I. Background

### A. B.S.'s Education

B.S. received special education services on and off from kindergarten through high school to address developmental delays, particularly related to speech development. He was diagnosed with autism in high school. In detailing this history, we recite the facts pertinent to Ms. S.'s arguments on appeal.

In 2009, B.S. enrolled in the ninth grade at Fryeburg Academy, a contract high school for students residing in Regional School Unit 72 (the "school district"). Before beginning school, an Individualized Education Program ("IEP") team composed of school staff, Ms. S., and B.S. met and determined that B.S. did

- 3 -

not qualify for an IEP, but the team provided B.S. with a 504 Plan[1] to address language deficits. In ninth grade, B.S. also participated in Fryeburg Academy's "Transition Program" and was provided accommodations such as an allowance for delayed responses through his 504 Plan. By tenth grade, however, B.S. had a normal schedule of college-preparatory courses and no longer participated in the Transition Program.

In tenth grade, B.S. began to engage in inappropriate use of the Internet and was cyber-bullied by his peers. His first trimester grades included four "F" grades and one "D-" grade. After again determining in November 2010 that B.S. did not need special education services, the IEP team met next in May 2011 and concluded that B.S. was eligible for IDEA services, including speech language therapy, classroom accommodations, and sessions at the school's Learning Center.

At the beginning of B.S.'s eleventh grade year, the IEP team held another meeting to review the results of B.S.'s summer assessments and diagnoses. Over the summer, B.S. was diagnosed with "Autistic Disorder," "Mixed Receptive and Expressive Language Disorder," and "Depressive Disorder." In response, the IEP team required additional reporting on B.S.'s speech and language

---

[1] Even if a school district concludes that a student is not eligible for special education services under the IDEA, the district may offer some accommodations for a student under Section 504 of the Rehabilitation Act of 1973. See 29 U.S.C. § 794.

sessions and suggested B.S.'s participation in a planned social group that never came to fruition, but otherwise did not change B.S.'s IEP. On a weekly basis, Carie Heath, a speech and language services provider, worked with B.S. on his speech and language skills, as well as his social skills. During this time, Heath consulted with school staff and Ms. S. concerning B.S., and B.S. told Heath that he "felt good" about his progress. B.S.'s special education teacher testified that during the same period, B.S. became more involved with student activities and was "starting to come out of [his] shell."

However, in October 2011, B.S. began missing some of his classes, and, in November 2011, Ms. S. informed the school that she would be keeping B.S. home due to safety concerns resulting from bullying. Shortly thereafter, the IEP team met to address these concerns. In response to Ms. S.'s request that B.S. receive group-based social skills instruction, school staff informed her that the psychological services provider worked with students individually for scheduling reasons, but that B.S. was encouraged to engage in group activities and had been doing so through his involvement with the school's student union and sports teams. B.S.'s special education teacher also reported that B.S. was "making small advancements, but still needs prompting and coaxing." Nevertheless, the IEP team agreed that B.S.'s IEP should be enhanced to include a one-on-one educational technician escort

- 5 -

in and between all classes, to add a behavior plan, and to require daily meetings with his school advisor.

By December of his eleventh grade year, B.S. was evading his school escort and had reportedly stolen sneakers from one of the school's dormitories. As a result of the theft, the Fryeburg Academy Judicial Board expelled B.S. At a January 2012 IEP team meeting, the team determined that tutorial services were necessary pending B.S.'s return to a full-time program. On February 2, 2012, the team met again to identify possible alternative schools that B.S. might attend, including the REAL School for both disabled and nondisabled students who had difficulty in a traditional school setting. The following week, the REAL School offered B.S. admission to its program. The REAL School had a shortened-day program, prompting expressions of concern from Ms. S., but she nevertheless agreed to the placement.

In the months following B.S.'s mid-school-year placement at the REAL School, B.S. appeared both to have excelled and to have experienced setbacks. At a March IEP meeting, the team declined Ms. S.'s request for a longer school day but added social and transition goals to B.S.'s IEP. The REAL School also prepared a Positive Behavior Support Plan for B.S., and his June report card reflected grades above 90 in all of his courses, including a 98 in math and a 95 in English and social studies. His SAT scores, however, were rated in the tenth, seventh, and third percentiles

nationally for reading, writing, and math, respectively, and B.S. engaged in some questionable behavior involving the taking of money. In spite of these issues, Ms. S. lauded the program and its administrators in email exchanges, and she offered such praises as: "thanks for being so awesome," and "you guys are good." During this time, Heath continued to provide weekly speech and language services to B.S.

In the summer of 2012, the REAL School provided B.S. with nine hours of services with a licensed clinical social worker and three days of adventure programming. That same summer, licensed psychologist Laura Slap-Shelton concluded that B.S. had Autistic Disorder and "is a candidate for therapeutic residential placement for adolescents with Autistic Disorder and other developmental disorders."

At the end of August 2012, B.S.'s IEP team met again to review Dr. Slap-Shelton's evaluation. A written notice from the meeting indicates that B.S. "liked attending the REAL School" and "would not like to see anything change." Ms. S. indicated that the lengthy commute to and from the REAL School limited B.S.'s time to socialize and that she would like to see B.S. placed in a residential setting. The team met again in early September 2012 and could not reach a consensus concerning Dr. Slap-Shelton's evaluation and diagnosis of autism. The team raised concerns that Dr. Slap-Shelton's evaluation "did not conform with either local

or state standards for assessments." The team, however, agreed that B.S. should remain for a fifth year of high school for the 2013-2014 academic year. After the September 2012 meeting, a district-hired psychologist conducted additional testing of B.S.'s skills and potential disorders. The psychologist later testified that his role was not to make a diagnosis concerning autism, but that he "would be skeptical" of such a diagnosis. He also testified that a "residential program that requires 24-hours supervision doesn't seem to fit" B.S.'s needs, nor did an all-boys program.

In his senior year at the REAL School, B.S. participated in service activities, and in an email to Ms. S., the director of the REAL School described B.S.'s participation as "stunningly active" and reported that "[B.S.] contributed so much leadership and kindness to our group." B.S.'s first quarter report card reflected a grade of 98 in English, math, and science, and a grade of 95 in social studies. However, Ms. S. continued to object to the school's shortened day and B.S.'s lengthy commute. On October 16, 2012, Ms. S. informed the school district that she was "rejecting as inappropriate the IEP and placement offered" to B.S., and that she was removing B.S. from the REAL School and placing him at the Eagleton School in Massachusetts. Ms. S. also requested reimbursement for the costs of placing B.S. at the Eagleton School, which is a full-time, all-male residential program.

At a November 2012 IEP team meeting, the team noted that B.S. "had made excellent progress with developing social skills and progressing academically" at the REAL School and that they "did not agree with the need for a residential placement." Nevertheless, B.S. began attending Eagleton that month. In March 2013, the IEP team met again to discuss B.S.'s programming at Eagleton, and the school district's director of special services determined that B.S. should still be placed at the REAL School. By July 2013, the school's education director reported that B.S. had "blossomed socially" at Eagleton and that he would be ready to transition back to the REAL School for the fall of his fifth year of high school, with the proper social and language supports.

B.S. completed the Eagleton program in August 2013 and returned to the REAL School for the 2013–2014 year. From November 2012 through August 2013, Ms. S. spent $115,782.50 on B.S.'s placement at the Eagleton School.[2]

## B. The Filing Limitation

In the fall of 2009, as B.S. was beginning ninth grade at Fryeburg Academy, the MDOE was beginning the process to revise certain rules within the Maine Unified Special Education Regulation ("MUSER"). The Maine APA governs the process to amend

---

[2] In her brief, Ms. S. states that costs totaled $119,147.00. However, the magistrate judge identified Ms. S.'s costs as $115,782.30. Ms. S. does not address this discrepancy in her briefing.

MUSER, and MUSER, a state regulation, controls the process for requesting a due process hearing under the IDEA. Although the IDEA and its corresponding federal regulations provide default provisions for this due process hearing procedure, the IDEA permits states to vary some of these provisions. See 20 U.S.C. § 1415(f)(3)(C).

Two specific MUSER provisions are relevant here. The first is the filing limitation, which, as discussed above, specifies the time a parent or school district has to file a request for a due process hearing after the date the parent or district "knew or should have known about the alleged action that forms the basis of the due process hearing request." Me. Code R. 05-071, Ch. 101 ("MUSER") § XVI.13.E. MUSER also contains a separate provision -- referred to herein as the "look-back term" -- that limits how far back in time a claim may reach once a parent knows or should have known of an asserted violation. Id. § XVI.5.A(2).

Prior to the MDOE's efforts to amend MUSER in 2009-2010, the filing limitation and the look-back term each stood at four years.[3] Thus, in certain circumstances, a parent might have had eight years from the date of an alleged violation to file an IDEA due process hearing request: the violation could have taken place

_____

[3] The federal default is two years for each. 34 C.F.R. §§ 300.507(a)(2), 300.511(e).

up to four years before the parent knew or should have known about the violation (the look-back term), and then, from the point at which the parent knew or should have known about the violation, the parent had another four years to decide if he or she would like to request a due process hearing (the filing limitation).

In November 2009, the MDOE issued a "Notice of Agency Rule-making Proposal," which identified a variety of proposed changes to MUSER, including that "the statute of limitations for due process hearings will be changed to the federal standard of two years." To accompany the public notice statement, the MDOE published at least two versions[4] of MUSER that indicated the MDOE's proposed changes by striking through old language and underlining new proposed language. Both versions explicitly changed the look-

---

[4] One version of the proposed regulation is identified as "Proposed For Provisional Adoption November 2009" and the other version is identified as "Proposed Emergency Refinements Fall 2009." The former version was not provided in the record but is publicly available. We take judicial notice of proposed agency rules and the public record materials relating to the rulemaking process. See Redfern v. Napolitano, 727 F.3d 77, 83 n.4 (1st Cir. 2013) (taking judicial notice of the Transportation Security Administration's notice of proposed rulemaking); see also Ams. for Prosperity Found. v. Harris, 809 F.3d 536, 538 n.1 (9th Cir. 2015) (per curiam) (taking judicial notice of a proposed state regulation).

Although the pagination differs between the two versions, the content of both versions is identical with regard to the look-back term and the filing limitation. Compare "Proposed for Provisional Adoption," Maine Unified Special Education Regulation Birth to Age Twenty, at 161, 171 (proposed Nov. 2009), with "Proposed Emergency Refinements," Maine Unified Special Education Regulation Birth to Age Twenty, at 160, 170 (proposed Fall 2009).

back term from four years to two years.  However, neither version indicated any change to the filing limitation, and, instead, left the provision untouched at four years.

In accordance with MAPA procedures, the MDOE scheduled a public hearing in December 2009 to discuss the proposed changes. In January 2010, after the notice and comment period, the MDOE filed the now "provisionally adopted rules" -- which contained a proposed two-year look-back term and an unchanged four-year filing limitation -- with the Maine Secretary of State and submitted the rules to the Maine Legislature for its required review.

While this standard rulemaking was taking place, the MDOE had also taken advantage of an expedited MAPA procedure allowing a rule to take effect on a temporary, "emergency" basis. The emergency rule contained several of the same changes to MUSER, including a change to the "statute of limitations for due process hearings."  Consistent with the earlier filings, the emergency rule included a two-year look-back term and an unchanged filing limitation of four years.  This emergency rule was adopted by the agency in January 2010 and then submitted to the Maine Legislature for permanent adoption, along with the provisionally adopted rule, later that month.  The Legislature's Joint Standing Committee on Education and Cultural Affairs ("Joint Standing Committee") considered the emergency and provisionally adopted rules in

- 12 -

tandem, conducting a public hearing and multiple work sessions in February 2010.

The Maine Legislature then approved the emergency and provisionally adopted rules with some amendments but none that altered the filing limitation from four years to two years.[5] Following the MAPA-mandated legislative review, the MDOE adopted a final version of MUSER. Here, for the first time, MUSER listed the filing limitation as two years from the date a parent knew or should have known about an alleged violation. The look-back term also was listed as two years, as it had been in the proposed, emergency, and provisionally adopted versions of the rule.

## C. Procedural History

In May 2013, Ms. S. filed a request for a due process hearing with the MDOE concerning alleged violations in each of B.S.'s high school years. The hearing officer dismissed the claims that arose during the ninth and tenth grades as barred by the two-year filing limitation. The hearing officer then found that the school district did not provide B.S. with a FAPE for the ten-day period following his expulsion from Fryeburg Academy in his eleventh grade year, but B.S. did receive a FAPE during the

---

[5] The legislative resolve adopting the MDOE's MUSER proposal included a provision that appears to amend the statute of limitations for a state complaint process, which is outlined in MUSER section XVI.4. This complaint process is distinct from the due process hearing request procedure at issue here. Compare MUSER § XVI.4, with id. § XVI.5, .13.

remainder of his eleventh grade year and throughout his twelfth grade year.

Ms. S. sought judicial review in the district court,[6] arguing that the two-year filing limitation is void because it was not passed in compliance with the Maine APA, and hence B.S.'s ninth and tenth grade claims should be restored. In connection with her claims, Ms. S. sought reimbursement for costs associated with B.S.'s private placement at the Eagleton School "and/or compensatory educational services for BS." The school district did not appeal the hearing officer's minor ruling in Ms. S.'s favor regarding the ten-day period following B.S.'s expulsion from Fryeburg Academy. The magistrate judge recommended that the district court hold the two-year filing limitation valid because the Maine Legislature reviewed and approved the two-year filing limitation when it approved subsequent amendments to other parts of MUSER in post-2010 rulemakings, including in 2011 and 2012.

The district court adopted the recommendation on this point, and it added that evidence of the Legislature's intent in early 2010 supports the conclusion that the Legislature approved a two-year filing limitation at the same time that it approved the

---

[6] Under the IDEA, "[a]ny party aggrieved by the findings and decision made under [the 'Impartial due process hearing' subsection of the IDEA] . . . shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A).

proposed two-year look-back term.  The district court also adopted the recommendation that Ms. S. did not qualify for an exception to the limitation period and that B.S. received a FAPE in the remainder of his eleventh grade year and throughout his twelfth grade year.

## II. Standard of Review

We review de novo the validity of the two-year filing limitation under MAPA.  See Town of Johnston v. Fed. Hous. Fin. Agency, 765 F.3d 80, 83 (1st Cir. 2014).  With regard to Ms. S.'s eleventh and twelfth grade IDEA claims, we "review the district court's answers to questions of law de novo and its findings of fact for clear error."  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 36 (1st Cir. 2012) (quoting C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008)).  When faced with mixed questions of law and fact, such as whether an IEP is adequate or a student received a FAPE, "our degree of deference depends on whether a particular determination is dominated by law or fact."  Id. at 36.

## III. The Maine Administrative Procedure Act

Ms. S. argues that the district court erred in holding that the MDOE promulgated the two-year filing limitation rule in accordance with MAPA.  She asserts that the MDOE "made an unauthorized unilateral change to the Filing Limitation Term," and that the MDOE's failure to comply with MAPA should render the two-

year filing limitation void. As a result, Ms. S. argues, we should conclude that the ninth and tenth grade claims were timely brought within the four-year filing period.

MAPA ordinarily requires an agency to promulgate certain non-technical, major substantive rules (such as the rules changing the filing limitation) via a two-step process. The first step requires the agency to provide public notice of the proposed rule and an opportunity for comment. See Me. Rev. Stat. Ann. tit. 5, § 8053. The second step, which is the primary focus of our analysis, requires legislative review of the proposed rule. See id. § 8072. If an agency violates MAPA's rulemaking procedure, MAPA's "Judicial Review" provision prescribes whether the rule nevertheless survives depending on the nature and impact of the violation. See id. § 8058.

The district court did not address the notice step of the rulemaking process. The court looked to the Legislature's intent in 2010 as well as the Legislature's approval of rulemakings in 2011 and 2012 to conclude that the two-year filing limitation was valid. As we explain below, the court's assessment of the rulemaking's compliance with MAPA's legislative review requirements was flawed in three respects: (1) it erroneously analyzed certain materials regarding the Legislature's intent to approve a two-year filing limitation; (2) it erroneously concluded that subsequent years' rulemakings cured any prior deficiencies;

and (3) it failed to apply a MAPA-provided review standard to evaluate the rulemaking missteps.  On the record before us, however, we are unable to determine whether these errors undermine the court's conclusion that the two-year filing limitation is valid.  We therefore remand the case to the district court to be decided in accordance with the guidance provided below.

Regrettably, we cannot explain our remand decision without describing the complexities of MAPA.  We thus begin by examining MAPA's legal framework.

## A.  MAPA Rulemaking[7]

Under MAPA, a state agency seeking to adopt a "major substantive rule" may initiate the rulemaking process in two ways:[8] by following the standard procedures prescribed for such rules or by seeking temporary adoption of an "emergency rule."  Me. Rev. Stat. Ann. tit. 5, §§ 8072, 8073.  The two paths may be pursued simultaneously, which is what occurred here.  See id.  Hence, because the MDOE proposed the filing limitation as both a major

---

[7] To help the reader navigate the relationship among the various provisions of MAPA, we have provided an appendix that identifies the relevant sections of the Act and describes briefly the subject matter of these sections.

[8] Major substantive rules include those that, "in the judgment of the Legislature, . . . [r]equire the exercise of significant agency discretion or interpretation in drafting" or "are reasonably expected to result in . . . the loss or significant reduction of government benefits or services."  Me. Rev. Stat. Ann. tit. 5, § 8071.2.B.  It is undisputed that the rulemaking at issue here involved a major substantive rule.

substantive rule and an emergency rule, we review the MAPA requirements for each.

Although major substantive rules are subject to greater scrutiny than routine technical rules, the standard rulemaking process begins with the same notice and comment procedures applicable to such routine rules. See id. §§ 8072, 8052, 8053. In addition, "every major substantive rule is also subject to legislative review," as described in MAPA section 8072. Id. § 8072 (preamble); see also id. § 8071.3.B. A major substantive "rule has legal effect only after review by the Legislature followed by final adoption by the agency."[9] Id. § 8072.1.

A major substantive rule also may be proposed as an "emergency rule," i.e., one that "is necessary to avoid an immediate threat to public health, safety or general welfare." Id. §§ 8054.1, 8073. If an agency finds that implementation of a rule meets this standard, it may "modify" the rulemaking

---

[9] Under the version of MAPA in place in 2010, a loophole in the statutory text may have allowed a rule that was submitted to the Legislature to take effect without legislative action, even if the rule was submitted outside of the legislative rule acceptance period. See Final Report of the State and Local Gov't Comm. Study of the Rule-making Process under the Maine Administrative Procedure Act, 124th Leg., 2d Sess., at i (Me. 2010); Me. Rev. Stat. Ann. tit. 5, § 8072.7 (2005). In 2011, the Legislature amended MAPA to clarify that, where an agency submits a provisionally adopted rule "during the legislative rule acceptance period and the Legislature fails to act," the agency may finally adopt the rule. Me. Rev. Stat. Ann. tit. 5, § 8072.11 (2011) (emphasis added).

requirements to accelerate "adoption of rules designed to mitigate or alleviate the threat found." Id. § 8054.1. Emergency rules, however, are not permanent. In certain circumstances, an emergency major substantive rule may be effective "for up to 12 months or until the Legislature has completed review."[10] Id. § 8073. Thus, at the very least,[11] the Legislature must review any changes to a major substantive rule adopted through the emergency process to make such a rule permanent.

## B. MAPA Judicial Review

MAPA section 8058 sets forth the judicial review standards for alleged agency rulemaking violations.[12] Me. Rev.

---

[10] The emergency major substantive rule at issue here was, in fact, slated to be "in effect for one year, except that the Legislature may enact legislation to authorize, amend or disapprove of the final adoption of these changes." An emergency major substantive rule may be effective for up to twelve months if it is "adopted . . . after the deadline for submission to the Legislature for review." Me. Rev. Stat. Ann. tit. 5, § 8073. Otherwise, such a rule is effective for only 90 days. See id. §§ 8054.3, 8073.

[11] MAPA does not expressly state that compliance with standard notice procedures also is necessary where, as here, a major substantive rule change has been implemented on an emergency basis for a twelve-month period. See Me. Rev. Stat. Ann. tit. 5, § 8073. As we note infra, we leave it to the district court to address this issue in the first instance.

[12] Section 8058.1 affords judicial review to individuals seeking "declaratory judgment in the Superior Court." Me. Rev. Stat. Ann. tit. 5, § 8058.1. Subsection 2 states that "[t]he failure to seek judicial review of an agency rule in the manner provided by subsection 1 shall not preclude judicial review thereof in any civil or criminal proceeding." Id. § 8058.2. Hence, the Maine Supreme Judicial Court, sitting as the Law Court ("Law Court"), rejected any reading of subsection 1 that limits judicial

- 19 -

Stat. Ann. tit. 5, § 8058.  Curiously, neither party's briefing, either to us or the district court, refers to this provision when evaluating whether the Maine Legislature reviewed the reduced filing limitation in accordance with MAPA in 2010.[13]  Not surprisingly, given this omission, the district court did not refer to it in its order.  In light of these omissions, we arguably could avoid the question of the appropriate standard for judicial review by invoking the waiver doctrine.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  However, the parties have asked us to decide whether the two-year filing limitation is valid for the purpose of resolving Ms. S.'s IDEA claims.  In our view, it would be imprudent to ignore a factor critical to a challenge to a rule's adequacy and to ignore the statutory text of MAPA's "Judicial Review" provision.  See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446 ("[W]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper

review to rule challenges brought in declaratory and enforcement actions.  See Conservation Law Found., Inc. v. Dep't of Envtl. Prot., 823 A.2d 551, 558 (Me. 2003).

[13] The parties briefly touch on, but do not develop, the issue in their discussion of subsequent rulemakings in 2010-2011, 2011-2012, and 2012-2013.  They do not discuss the different standards with respect to the 2009-2010 rulemaking violations primarily at issue here.

construction of governing law." (quoting <u>Kamen</u> v. <u>Kemper Fin.</u>
<u>Servs., Inc.</u>, 500 U.S. 90, 99 (1991))). Moreover, our discussion
of the proper scope of the court's review under MAPA does not
result in a merits decision by us as to the validity of the filing
limitation. Rather, we raise this issue to properly frame the
district court's review of the case on remand.

The applicable MAPA review standard depends upon the
type of MAPA violation. Hence, we must classify the failure to
comply with MAPA's legislative review procedure as a particular
type of violation in order to determine the appropriate review
standard for such a violation. Section 8058 sets the scope of
judicial review for three types of rulemaking violations: (1) if
the "rule exceeds the rule-making authority of the agency," (2) if
the rule "is void under section 8057" of MAPA (discussed below),
and (3) "any other procedural error." Me. Rev. Sat. Ann. tit. 5,
§ 8058.1.

If a court finds either of the first two types of
violations, the court must hold the rule invalid. <u>Id.</u> In a case
dealing with the third type of MAPA violation -- "any other
procedural error" -- the court may find the rule invalid only if
the procedural error is substantial and "of such central relevance
to the rule that there is a substantial likelihood that the rule
would have been significantly changed if the error had not
occurred." <u>Id.</u> The Maine Law Court has described the "substantial

- 21 -

likelihood" standard as "a harmless error standard similar to that employed in ordinary civil litigation." Fulkerson v. Comm'r, Me. Dep't of Human Servs., 628 A.2d 661, 663 (Me. 1993).

The Law Court also concluded that the two different review standards -- automatic invalidation and harmless error -- reflect the Legislature's "inten[t] to narrow the circumstances in which procedural error would automatically invalidate a rule." Id. at 663-64. The court found that the "circumstances in which invalidation [of a rule] is automatic principally involve a denial of public participation." Id. at 664.

Here, the parties do not dispute the general rulemaking authority of the MDOE as to MUSER (which would implicate the first type of rulemaking violation), and we thus focus only on the second and third types of rulemaking violation. The second type consists of violations that would make a rule "void under section 8057" of MAPA. Me. Rev. Stat. Ann. tit. 5, § 8058.1. Section 8057 requires compliance with four sections of MAPA: two govern the general rulemaking and public notice process (sections 8052 and 8053), one governs emergency rulemaking (section 8054), and one governs the filing and publication of an adopted rule (section 8056). Id. § 8057.1-.2. Section 8057 states that failure to comply with certain parts of these sections renders a rule "void and of no legal effect, except that insubstantial deviations from the requirements of section 8053," i.e., the section governing notice,

"do not invalidate the rule subsequently adopted." Id. § 8057.1; see also id. § 8057.2. The judicial review standard in section 8058 then reinforces this scheme by stating that, if a "court finds that a rule . . . is void under section 8057, . . . it shall declare the rule invalid." Id. § 8058.1. In sum, a court reviewing certain alleged violations of sections 8052, 8053, 8054, or 8056 must consider whether such a violation occurred, and, absent the insubstantial deviation exception for notice, if the court finds a violation, it must declare the rule invalid.

Meanwhile, the third type of violation encompasses all "other procedural error[s]." Id. § 8058.1. It follows that such errors are those that do not constitute an agency transgression of its rulemaking authority (i.e., the first type of violation) and those that are not addressed in MAPA's compliance section, section 8057 (i.e., the second type of violation). See id.

The legislative review stage of the rulemaking process is governed by sections 8071 and 8072 of MAPA, neither of which is discussed in MAPA's compliance section. See id. § 8057. Section 8057 also does not address failures to comply with certain parts of the MAPA section governing emergency major substantive rules. See id. §§ 8057, 8073. Thus, errors at these stages appear to fall into the third, catch-all "any other procedural error" category and warrant harmless error review under MAPA section 8058. Id. § 8058.1.

We must, however, address one other consideration in a court's review of a rulemaking's compliance with the legislative review process. Section 8072 expressly states that a provisionally adopted major substantive rule "has legal effect only after review by the Legislature followed by final adoption by the agency." Id. § 8072.1. Standing alone, this language suggests that the utter absence of legislative review for a major substantive rule may preclude the validity of a finally adopted rule. Although both past and present versions of section 8072 allow for a rule to take legal effect without legislative action in certain circumstances,[14] see supra note 9, it is fair to say that the Legislature at least must have had the opportunity to review the substance of a finally adopted rule in the section 8072 process. Absent such opportunity, it may be that a final major substantive rule cannot survive judicial scrutiny under section 8058. How these nuances play out in this case is best left to the district court to address in the first instance.

## C.  Adoption of the Two-Year Filing Limitation

The challenge in this case to the validity of the two-year filing limitation is not a surprise. The MDOE's rulemaking actions surrounding the overall MUSER changes in 2009-2010 fostered confusion and concern. In fact, this rulemaking prompted

---

[14] The school district nowhere contends that the two-year filing limitation is valid as a result of this loophole.

the passage of a bill in the Maine Legislature to commission a report on state agency rulemaking efforts under MAPA. See Final Report of the State and Local Gov't Comm. Study of the Rule-making Process under the Maine Administrative Procedure Act, 124th Leg., 2d Sess. (Me. 2010). The resulting public report discusses government confusion concerning the process for permanent adoption of an emergency rule and, more significantly, it observes that many saw the MDOE changes to MUSER as "a continuation of a process in which the department was frustrating the will of the Legislature by adopting policies that were not consistent with direction given by the Legislature." Id. at App. B, 4 & n.2.

With respect to the specific MUSER provisions at issue here, the phrase "statute of limitations" is used without definition by the MDOE in its public notice statement, by the MDOE Commissioner in her testimony to the Maine Legislature, by many additional witnesses and advocates, and by the Legislature itself. Both the filing limitation and look-back term involve time restrictions, and both periods were originally four years while the parallel federal periods are both two years. Hence, the "statute of limitations" label could be used to describe the filing limitation, the look-back term, or both. This imprecision complicated the rulemaking process.

As described above, the standard process for implementing a major substantive rule involves two steps, notice-

and-comment and legislative review.  Ms. S. asserts error in both steps of the 2009-2010 rulemaking, but does not account for the rulemaking's parallel, emergency track.  We briefly address notice before moving on to the three errors we detect in the district court's discussion of the legislative review step.  These three errors concern the court's treatment of legislative intent, subsequent rulemakings, and MAPA's judicial review standards.

## 1. Notice

Ms. S. asserts on appeal that the 2010 final adopted filing limitation is invalid because the MDOE did not provide the public notice or opportunity for comment that is required in the rulemaking process.[15]  Although Ms. S. raised the adequacy of notice in the district court,[16] that issue received little attention from either the district court or the parties.  For example, no consideration was given to whether the MDOE must provide public

---

[15] In her brief, Ms. S. argues that the MDOE implemented the two-year filing limitation in 2010 "[w]ithout [p]ublic [n]otice and [c]omment," that the MDOE proposed shortening the "Look-Back Term—but not the Filing Limitation Term," and that rule changes require "public notice and comment" under section 8052.

[16] For example, in Ms. S.'s memorandum objecting to the school district's motion to dismiss, Ms. S. argued that the "alteration of the Final Adoption version of [MUSER] . . . occurred in the absence of any public notice of this change, [or] any public comment relating to this change."  In a subsequent brief to the district court, the school district acknowledged this argument, noting that "[a]s Plaintiff has argued from the beginning, she continues to assert that the Maine DOE itself adopted the two-year limitation period without proper notice, comment or approval by the Maine Legislature."

- 26 -

notice when making permanent an emergency major substantive rule and, if so, whether the MDOE provided adequate notice here. We think these questions are more appropriately handled by the district court in the first instance. See Town of Barnstable v. O'Connor, 786 F.3d 130, 141–43 (1st Cir. 2015) (declining to decide and remanding a question of law advanced by a party but not decided in the district court); see also Singleton v. Wulff, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."). Depending on the court's resolution of other issues, it may need to consider these notice questions on remand.

### 2. Legislative Intent

As described above, the rule proposed in 2009 and approved by the Legislature in 2010 did not include language reducing the filing limitation. Nevertheless, the district court concluded that the requisite legislative review occurred, in part, because the record supported a finding that the Legislature in 2010 intended to approve a two-year filing limitation.

Ms. S. argues that courts may never consider lawmakers' intent when evaluating whether a rulemaking complied with MAPA's procedural requirements. We reject the assertion that legislative intent is entirely irrelevant to MAPA compliance. For instance,

- 27 -

we can envision a court looking beyond the text of the regulatory documents when conducting the harmless error inquiry prescribed by MAPA section 8058.  See Me. Rev. Stat. Ann. tit. 5, § 8058.1.

Of course, in some circumstances, a court's consideration of legislative intent is improper.  Ordinarily, the Law Court does not look beyond language approved by the Legislature to determine the Legislature's intent where, as here, the language is unambiguous.  See State v. Hood, 482 A.2d 1268, 1270 (Me. 1984). The rule approved by the Legislature contained express language specifying a filing limitation of "four years."  In addition, the legislative resolve approving the rule made no changes to that text.[17]

Nonetheless, the district court found that reference to legislative intent was necessary to avoid "absurd, inconsistent, unreasonable or illogical" results.  State v. Niles, 585 A.2d 181, 182 (Me. 1990).  The court concluded that the combination of a two-year look-back term and a four-year filing limitation created an illogical result because the "scheme would give parents more time to take an action within their control . . . yet restrict their rights with respect to a factor farther outside of their control."

---

[17] Given the clarity of the text here, we need not confront Ms. S.'s suggestion that it is inappropriate to look to legislative intent even where the text of an agency rule is ambiguous.

We disagree that logic requires either identical timelines for both the look-back term and the filing limitation or a longer timeline for the look-back term. While a longer filing limitation would not mirror the federal regulatory scheme, it could reflect a plan to give parents more time for at least one stage of the process. Indeed, it does not strike us as illogical to give parents more time to consult with counsel, consider their options, and decide how to proceed once they are aware that a violation took place. The court therefore erred in finding an illogical outcome that required the court to examine legislative intent.

In any event, the evidence that the court relied upon as "unequivocal expressions" of the Legislature's intent does not provide conclusive support for the court's finding. In concluding that the Legislature intended to approve a two-year filing limitation, the district court pointed to witness testimony submitted to the Joint Standing Committee, which was reviewing the changes to MUSER. The limited materials presented to the district court show that the MDOE Commissioner and multiple other witnesses submitted testimony that included vague reference to a change to the "statute of limitations." However, much of the written testimony in these materials also included specific page references to the text of the proposed rule, linking the witness's position with the exact MUSER provision at issue. When discussing changes to the "statute of limitations," the testimony of the MDOE

Commissioner and multiple other witnesses before the Committee include page references that correspond solely to the look-back term -- and not the filing limitation -- in the November 2009 "Proposed for Provisional Adoption" version of the rule. See "Proposed for Provisional Adoption," Maine Unified Special Education Regulation Birth to Age Twenty, at 161, 223 (proposed Nov. 2009). In light of these specific page references, we do not interpret this testimony as a clear indication that the Legislature reviewed the two-year filing limitation.[18]

For additional support for its conclusion, the district court looked to the published report of the Joint Standing Committee's vote on the MDOE's proposed changes to MUSER. Based on this report, the court found that, "by a vote of seven to five, [the Committee decided that] '[t]he statute of limitations for due process hearings is changed to the federal standard of two years'" (second alteration in original). However, a closer examination of the report reveals that the Joint Standing Committee voted that a rule change to reduce "[t]he statute of limitations for due process hearings" to two years ought not to pass, or "ONTP," by a vote of

---

[18] Although some of the testimony uses such language as "filing a due process hearing request," such language may indicate that the only provision under review was the look-back term. We observe that the look-back term appears in MUSER under the heading "Filing a Due Process Hearing Request," MUSER § XVI.5, while the filing limitation falls under the separate "Impartial Due Process Hearing" section of the rule, MUSER § XVI.13.

seven to five -- as opposed to the district court's assertion that the Committee approved the change by such a vote.[19]  Although subsequent committee vote tallies, of which we take judicial notice, see Territory of Alaska v. Am. Can Co., 358 U.S. 224, 226-27 (1959), suggest that the Joint Standing Committee may have reconsidered the measure, the precise subject of those subsequent votes remains unclear.  See Joint Standing Comm. on Educ. and Cultural Affairs, 124th Leg., Committee Voting Tally Sheets, L.D. 1741-4g (Me. Feb. 25, 2010).  Accordingly, to the extent the district court refers to these rulemaking materials on remand, it will need to reevaluate their content.

### 3.  Subsequent Rulemakings

The district court also offered a ratification rationale for finding the rule valid notwithstanding the legislative review issues of the original 2009-2010 rulemaking.  The court, agreeing with the magistrate judge, concluded that the Legislature effected a post hoc ratification of the two-year period when it reviewed

---

[19] Understandably, the district court may have been led astray by the phrasing in the report, which noted: "The statute of limitations for due process hearings is changed to the federal standard of two years" (emphasis added).  However, the report's use of this affirmative "is changed" language may be attributable to the fact that the rule had already taken effect on a temporary emergency basis, as discussed above, when the Joint Standing Committee was voting on its permanent implementation.

changes to other parts of MUSER in subsequent rulemaking proceedings in 2011 and 2012.

However, consistent with its review of the original rulemaking, the district court did not consider the issue of notice when it examined the subsequent rulemakings. It again reviewed only whether the Legislature had approved the proposed rules. Yet, as both parties recognize, the subsequent proceedings were subject to the MAPA requirement of notice and an opportunity for public comment. See Me. Rev. Stat. Ann. tit. 5, §§ 8052, 8053. The record provides no indication that the MDOE gave notice to the public of any change to the length of the filing limitation period in these subsequent, standard rulemakings.

The school district argues that the failure to alert the public to this change in the subsequent rulemakings is an "insubstantial deviation[s]" from MAPA's notice requirements because the text of the proposed rules in those later years included the two-year filing limitation. See id. § 8057.1. However, if merely including language in the body of a rule without identifying it as a change were sufficient to provide notice, MAPA's notice requirement would have no meaning. An agency could simply bury new language in a previously existing rule, putting an unreasonable burden on the public to unearth the language and identify it as a change. We reject this approach as inconsistent with the Law Court's view of the importance of notice and "public

participation" in the rulemaking process.  See Fulkerson, 628 A.2d at 664.  Therefore, given the lack of notice in the subsequent rulemakings, the district court erred in finding that these later proceedings cured the defects in the original 2009-2010 rulemaking.  See Me. Rev. Stat. Ann. tit. 5, §§ 8052, 8053, 8057.1, 8058.1.

### 4. Judicial Review

As discussed above, the review that a court applies to a particular type of MAPA violation may dictate whether, in spite of the violation, the rule has legal effect.  The district court's decision did not reflect consideration of either the different judicial review standards set forth in section 8058 or the fact that section 8072 gives legal effect to a rule only if, at a minimum, the Legislature had the opportunity to review it.  See Me. Rev. Stat. Ann. tit. 5, §§ 8058.1, 8072.1.  Therefore, the district court erred when it did not apply a MAPA-provided review standard.

## D. MAPA Summary and Guidance on Remand

In sum, we conclude that the district court did not properly evaluate the validity of the two-year filing limitation under MAPA's prescribed rulemaking procedures.  The district court did not address the notice issue raised by Ms. S. as to the original 2009-2010 rulemaking.  In addition, it made three errors when evaluating the 2009-2010 rulemaking's compliance with MAPA's

legislative review requirements: (1) it erroneously analyzed certain materials regarding the Legislature's intent; (2) it concluded that subsequent rulemakings cured defects in the original 2009-2010 rulemaking; and (3) it did not apply a MAPA-provided review standard to legislative-review-stage violations of the rulemaking process.

We recognize that, despite these errors, the court's ultimate conclusion -- that the two-year filing limitation is valid -- could be correct. However, we are unable to affirm that judgment in light of the district court's incomplete analysis, the parties' deficient briefing, and the murky record before us. We thus remand the case to the district court to reevaluate the validity of the two-year filing limitation.

On remand, the district court's resolution of the validity of the two-year filing limitation rule should apply the MAPA-provided judicial review framework, in keeping with the guidance provided herein. The public record for the 2009-2010 rulemaking process encompasses substantial materials far beyond those initially presented to the district court. The court may order the parties to develop the record and provide further briefing as necessary to make its determinations. We do not opine on whether materials beyond the 2009-2010 MAPA processes may be germane to the section 8058 analysis. We also do not opine on whether a certified question for the Law Court about the interplay

between MAPA's various provisions may be appropriate once the record is developed.

### IV. The Specific Misrepresentation Exception

The IDEA, and, in turn, MUSER, contain two exceptions to time restrictions imposed by the filing limitation. See 20 U.S.C. § 1415(f)(3)(D)(i)-(ii); MUSER § XVI.13.F(1)-(2). Relevant here is the "specific misrepresentation" exception, which sets aside the filing limitation "if the parent was prevented from filing a due process hearing request due to . . . [s]pecific misrepresentations by the [school district] that it had resolved the problem forming the basis of the due process hearing request."[20] MUSER § XVI.13.F-.F(1). Ms. S. argues that even if the filing limitation stands at two years, the IDEA's specific misrepresentation exception applies, and, as a result, the ninth and tenth grade claims are not time barred. Because we are remanding the case to the district court to determine the validity of the two-year filing limitation, we do not reach this issue.

### V. IDEA Claims

Setting aside the ninth and tenth grade claims, we focus on Ms. S.'s undisputedly timely claims. Ms. S. argues that the school district did not provide B.S. with a FAPE in his eleventh

---

[20] The second exception sets aside the filing limitation's time restriction if the school district withheld information that it was required to provide to the parent. MUSER § XVI.13.F(2).

and twelfth grade years. Under the IDEA, each state receiving federal IDEA funding must provide a FAPE "to all children with disabilities . . . between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A). To ensure that this takes place, a school district "must take steps to identify children who may qualify as disabled, evaluate each such child to determine his or her eligibility for statutory benefits, and develop a customized IEP designed to ensure that the child receives a level of educational benefits commensurate with a FAPE." Five Town, 513 F.3d at 285. The IDEA also mandates that, "[t]o the maximum extent appropriate," a school district's special education accommodations should take place in the "least restrictive environment" available. 20 U.S.C. § 1412(a)(5)–(a)(5)(A).

The IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children." Honig v. Doe, 484 U.S. 305, 311 (1988). A customized IEP "must include, 'at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered.'" Esposito, 675 F.3d at 34 (quoting Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008)). An IEP therefore "must target 'all of a child's special needs,'" including a child's social limitations. Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1089 (1st Cir. 1993)

- 36 -

(quoting Town of Burlington v. Dep't of Educ., 736 F.2d 773, 788 (1st Cir. 1984)).  However, "[t]he IDEA does not promise perfect solutions," id. at 1086, and "the obligation to devise a custom-tailored IEP does not imply that a disabled child is entitled to the maximum educational benefit possible," Esposito, 675 F.3d at 34 (quoting Lessard, 518 F.3d at 23).  We therefore review an IEP's compliance with the IDEA based on whether the IEP is "reasonably calculated to confer a meaningful educational benefit."  Esposito, 675 F.3d at 34.

## A.   Eleventh Grade (2011–2012)

Ms. S. argues that, in eleventh grade, B.S. did not receive adequate social skills instruction and that his mid-year placement in the REAL School "was not reasonably calculated to provide him with meaningful benefit."

The district court[21] concluded that the hearing officer adequately addressed the social skills instruction issue and that the school district was not required "to provide a student with his parent's first choice for services."  We agree.  In accordance with his IEP, B.S. met weekly with speech pathologist Heath to work on his speech, language, and social skills.  During this time, Heath consulted with school staff and Ms. S. concerning B.S., and

---

[21] The district court adopted in full the magistrate judge's recommendation concerning the eleventh and twelfth grade claims. We therefore refer to the magistrate judge's recommendations on these issues as the opinion of the "district court."

B.S. told her that he "felt good" about his progress. B.S.'s special education teacher testified that during the same period, B.S. became more involved with student activities and was "starting to come out of [his] shell." That fall, when Ms. S. kept B.S. home due to safety concerns resulting from bullying, the IEP team met to address those concerns. Although the school did not satisfy Ms. S.'s request to provide B.S. group-based social instruction because of scheduling difficulties, B.S. was encouraged to engage in group activities and was reported to have been doing so through his involvement with the school's student union and sports teams. The IEP team also enhanced B.S.'s IEP to include a one-on-one educational technician escort in between all classes, to add a behavior plan, and to require daily meetings with his school advisor. Although the plan may not have met the appellant's specific requests concerning group-based instruction, the IEP team put in place measures to address B.S.'s social needs and limitations. The district court did not err in concluding that no violation occurred.[22]

---

[22] Ms. S. also argues that the district court held her to an improper standard of proof when it stated that, "[i]n the absence of any evidence that direct 'social skills instruction[]' . . . would necessarily have significantly reduced BS's elopements or significantly improved his relationships with his peers during his first two months at a new school, the plaintiff takes nothing by this argument." (second alteration in original). We do not read this statement to establish a new burden of proof; instead, we view it as an articulation of the fact that a particular service

Ms. S. also argues that the school district's placement of B.S. in the REAL School following his expulsion from Fryeburg Academy did not meaningfully benefit B.S. Ms. S. posits that the REAL School did not provide B.S. with the appropriate programming given the school's shortened day and lack of an on-staff speech pathologist. The district court found no evidence to support Ms. S.'s conclusion that the REAL School was an improper placement for B.S. We again find no error in this determination. Under state regulations, an "abbreviated school day" is "any day that a child . . . attends school or receives educational services for less time than age/grade peers without disabilities within the same school and/or school program." MUSER § II.1 (emphasis added). B.S.'s day was no shorter than his peers at the REAL School. In fact, school officials testified that the REAL School's abbreviated day works out to the same amount of instructional time as B.S. would have received at a traditional public high school where students have significant amounts of "holding time," such as homeroom and time between classes. Furthermore, while the REAL School did not have a speech pathologist on staff, Heath continued to provide speech therapy to B.S. on a weekly basis while he attended the REAL School. Thus, the district court did not err

_____

was no more likely to address B.S.'s social skills issues than the ones already proposed and implemented by the school district.

- 39 -

when it determined that B.S. received a FAPE in the eleventh grade, and we affirm this judgment.

**B.  Twelfth Grade (2012-2013)**

Ms. S. asserts the same claims concerning the REAL School in B.S.'s twelfth grade year as she did regarding his placement there in his eleventh grade year.  The district court ruled that B.S. again received a FAPE in twelfth grade.  For the reasons discussed above, we affirm this judgment.

## VI. Conclusion

For the foregoing reasons, we vacate the district court's judgment that the two-year filing limitation is valid under the Maine APA and remand to the district court for further proceedings consistent with this opinion.  We affirm the district court's judgment that B.S. received a FAPE in the eleventh and twelfth grades.  Each party shall bear its own costs.

So ordered.

**--Concurring Opinion Follows--**

**LYNCH**, **Circuit Judge**, **concurring**.  With the greatest respect for my colleagues, I write separately to express my views.

I fully join the holding affirming that B.S. received a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), for his eleventh and twelfth grade years.

The issue of the appropriate limitation period for the filing of the plaintiff's claim, particularly as to the ninth and tenth grade years, is controlled by a federal statute, 20 U.S.C. § 1415(f)(3)(C), which receives too little attention from the parties.  That federal statute states that a parent has two years to file a complaint from when the parent "knew or should have known about the alleged action that forms the basis of the complaint, or if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows."  Id.; see also 34 C.F.R. § 300.511(e).  As I understand the provision, a state's limitation period is adopted if and only if the state has an "explicit time limitation," otherwise the federal default period of two years is used.

The parties have assumed that Maine has an "explicit time limitation" in its state regulation, Me. Code R. 05-071, Ch. 101 ("MUSER") § XVI.13.E, which on its face provides for a limitation period of two years.  Ms. S. assumes that she is nonetheless free to attack the validity of this state regulation

- 41 -

using the Maine Administrative Procedure Act ("MAPA"), as a matter of application of the governing federal IDEA statute. Based on that assumption, she argues that the state regulation is invalid under MAPA. The school system responds by defending the state regulation's validity in like terms.

It is not clear that the intent of 20 U.S.C. § 1415(f)(3)(C) is to permit a federal court to decide state administrative procedure questions about the validity of explicitly stated state administrative provisions. It could be that we are to take the state law on its face. Then again, it may be that those uncertainties about the time period under MAPA mean that Maine has not met the "explicit time limitation" requirement of the federal statute. If so, we would find the two-year federal limitation period applies for the ninth and tenth grade years. In either of the above-described scenarios, we would find that the governing limitation period is two years, that the plaintiff's claims as to the ninth and tenth grade years are not timely, and that judgment should be entered against her on those claims.

On the other hand, there may be reasons to think that the state law validity issue should be resolved. Still, that does not answer the question of who should resolve the issue or say that the federal court should resolve it. The parties have utterly failed to adequately brief the federal issues and have encouraged the court to enter the state law briar patch. My colleagues are

not to be faulted for walking down the path that the parties laid out for them.

Nevertheless, as to answering the question of the validity of the limitation period under Maine law, my view is that it is not the business of a federal court to tell Maine how to interpret its own administrative law. Doctrines of federalism, comity, and abstention all counsel against such incursions. See The Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Info. Servs., 608 F.3d 110, 119 (1st Cir. 2010) ("There are . . . strong federalism interests that are furthered by providing the state courts with the opportunity to decide on underlying unsettled questions of state law."), certified question answered, 946 N.E.2d 665 (Mass. 2011).

To the extent that the state regulation validity issue governs the timeliness analysis, I would have preferred to send this matter to the Maine Supreme Judicial Court for resolution or to have abstained and let the state courts resolve this matter. I agree that the question is important to the administration of IDEA programs and services in Maine, and that is exactly why the Maine Supreme Judicial Court, and not this court, should decide the state law question. See Fortin v. Titcomb, 671 F.3d 63, 71 (1st Cir. 2012) (certifying where "the choice between these two paths [was] a matter of state policy best left to the state's courts"), certified question answered, 60 A.3d 765 (Me. 2013). In my view,

the conditions for certification have been met.  See Darney v. Dragon Prods. Co., LLC, 994 A.2d 804, 806 (Me. 2010).  And here, we would benefit from certifying a question to the Maine Supreme Judicial Court, as we have in the past. See, e.g., Fortin, 671 F.3d at 64.[23]

---

[23]    As the majority notes, the district court may employ a method to have the state courts address the state law questions when it deems the record sufficiently developed.

I also think that on remand the FAPE question may be answered as to the ninth and tenth grade years before addressing the question about whether the claim was timely made as a matter of Maine law.  That is, if the district court finds that FAPE was provided as to those years, that would end the lawsuit.

This appendix lists the above-referenced provisions of the Maine Administrative Procedure Act, the formal title of each provision, and a brief description of each provision's relevant content.

**Section 8052.** **"Rulemaking"** - Sets forth the general process for agency adoption of a rule, which includes the requirements that an agency provide notice, hold a public hearing in certain circumstances, and adopt a written statement addressing submitted comments. See Me. Rev. Stat. Ann. tit. 5, § 8052.

**Section 8053.** **"Notice"** - Sets forth specific notice requirements, including necessary content and prescribed methods of publication. See id. § 8053.

**Section 8054.** **"Emergency rulemaking"** - Sets forth the process for agency adoption of an emergency rule, as opposed to an emergency major substantive rule. See id. § 8054. For a description of the provision concerning emergency major substantive rulemaking, see infra section 8073.

**Section 8056.** **"Filing and publication"** - Sets forth the agency requirements for submitting an adopted rule to the Maine Secretary of State for approval and publication. See id. § 8056.

**Section 8057.** **"Compliance"** - Explains that rules not adopted in accordance with certain parts of sections 8052 and 8056, or with sections 8053 and 8054 are "void and of no legal effect,

except that insubstantial deviations from the requirements of section 8053 do not invalidate the rule." Id. § 8057.1–.2.

Section 8058. "Judicial review of rules." - Sets forth the review standards for different types of MAPA violations, requiring automatic invalidation if the rule exceeds the agency's rulemaking authority or if the rule is void under section 8057, and requiring the courts to apply a harmless error review to "any other procedural error." Id. § 8058.1.

Section 8071. "Legislative review of certain agency rules" - Defines "major substantive rules" and subjects such rules to legislative review in accordance with the procedures set forth in section 8072. See id. § 8071.

Section 8072. "Legislative review of major substantive rules" - Sets forth the procedures for legislative review of major substantive rules and mandates that such rules have "legal effect only after review by the Legislature followed by final adoption by the agency." Id. § 8072.1.

Section 8073. "Emergency major substantive rules" - Sets forth the process for agency adoption of an emergency major substantive rule, and allows, in some circumstances, for such rules to "be effective for up to 12 months or until the Legislature has completed review." Id. § 8073.